Brochu and another, Respondents, vs. Taylor, Defendant:
Preferred Accident Insurance Company of New
York, Appellant, and five other cases.

*October 15—November 10, 1936.*

For the appellant there was a brief by *Hanitch, Johnson, Fritschler & Barstow* of Superior, and *Ernest E. Watson* of Minneapolis, Minnesota, and oral argument by *Mr. John C. Fritschler* and *Mr. Watson.*

For the respondents Alice J. Prigge, Lucille Lyons, Alfred Weyandt, Alyce McIntyre, and Lawrence A. Brochu there was a brief by *Curran & Leveroos* of Superior, and oral argument by *Henry N. Leveroos.*

For the respondent Raymond Follis there was a brief by *Hughes & Anderson* of Superior, and oral argument by *R. E. Anderson*.

NELSON, J.   The Insurance Company contends that the court erred in denying its motions: (1) To direct the verdicts in its favor; and (2) to change the answer of the jury to question No. 11 from "Yes" to "No," and for judgment in its favor upon the verdict as so changed.

The sole question requiring determination is whether the evidence adduced upon the trial supports the finding of the jury that at the time of the collision Lester LaTourneau was using the Rand automobile with the permission of Mr. Rand or with the permission of an adult member of his family. The question to be determined requires a recitation of the material facts.

Some time between 1 and 2 o'clock in the morning of Sunday, August 4, 1935, a comparatively new, seven-passenger Buick sedan belonging to Mr. Rand collided with the rear of a car occupied by the several plaintiffs, at a point about three and one-half miles east of the village of Brule.   Both cars were proceeding in an easterly direction.   At the time of the accident the Rand automobile was being driven by the defendant, Erma Taylor, who was employed as a maid in the Rand summer home.   Lester LaTourneau, who was employed by Mr. Rand as a chauffeur and general handy man, and one Woerle, a tavern keeper, were riding in the rear seat.   Mr. Rand was a resident of Minneapolis, Minnesota.   He owned a summer home in this state situated five or six miles south of the village of Brule.   His cabin was situated on the bank of the Brule river and about a hundred feet therefrom.   Back of the cabin there was a driveway.   His garage was located about two hundred fifty feet back of the cabin.   Back of the garage, and about sixty feet therefrom, there were cabins occupied by certain servants employed by Mr. Rand.   LaTour-

neau and Erma Taylor occupied quarters in those cabins. At the time of the accident, Mr. Rand owned and maintained at his summer home three automobiles, a seven-passenger, maroon-colored Buick sedan, a Buick town car, and a Ford station wagon. It was LaTourneau's duty as chauffeur to care for these cars, to see that they were kept in a state of repair, properly lubricated, and supplied with gasoline. The town car was known as Mrs. Rand's car. The station wagon was used for general household purposes, and the sedan was Mr. Rand's personal car. The Buick sedan was insured against public liability and property damage by the Insurance Company under a policy issued to Mr. Rand in the state of Minnesota. So much of that certain provision of the policy as is relevant to this controversy is as follows:

"To pay all sums which the assured shall become liable to pay as damages (either direct or in consequence of expenses and/or loss of services) imposed upon him by law for bodily injury, including death at any time resulting therefrom (herein called 'Bodily Injury'), sustained by any person or persons if caused accidentally by the ownership, maintenance or use of any automobile disclosed in the declarations for the purposes therein stated. . . .

"(1) The unqualified word 'assured' includes not only the named assured but any other person *using and having a legal right to use* any such automobile, including also any *other person* or organization legally responsible for the use thereof, provided the disclosed and *actual use* of such automobile is 'Pleasure and Business,' or 'Commercial,' each as defined herein, *and further provided that such use is with the permission of the named assured,* who, if an individual, may give such permission through an adult member of his household other than a chauffeur or domestic servant."

On Saturday evening, August 3, 1935, the Rands entertained a number of guests at dinner. The last of such guests left at about twenty minutes past eleven. At that time LaTourneau was still on duty. He banked the fire and assisted in closing up the cabin for the night. Upon completing his

duties LaTourneau said good night, and proceeded to his cabin where he remained about ten minutes. As he passed the cabin occupied by Erma Taylor, she asked him where he was going, and he told her that he was going to make a telephone call. He asked her if she wanted to take a ride with him. Shortly thereafter they got into the Buick sedan, which had been left facing in a direction away from the Rand cabin. LaTourneau, accompanied by Miss Taylor, drove the car to the village of Brule and stopped it in front of Ed. Woerle's tavern, apparently for the purpose of inviting Ed. Woerle to accompany them on a trip to Iron River, some twelve miles east of Brule. Ed. Woerle at that time was having some difficulty in getting rid of an intoxicated person, and told LaTourneau to drive around and come back. Thereupon LaTourneau got into the car and drove westerly as far as Weyandt's tavern, located about a mile from Woerle's place, where he stopped the car. After a comparatively short stay there he drove the automobile back to Woerle's tavern. LaTourneau got out of the car and went into the tavern. While he was in the tavern Erma Taylor, who had remained in the sedan, moved over into the driver's seat. Shortly thereafter LaTourneau and Woerle came out of the tavern and got into the rear seat. Miss Taylor started the car and drove easterly toward Iron River. After proceeding a distance of about three and one-half miles the sedan collided with the rear end of an automobile which was moving in the same direction, and which was occupied by the several plaintiffs. The jury found that at the time of the collision, Erma Taylor was not driving the automobile in question with the permission of Mr. Rand or with the permission of an adult member of his family. The only adult member of Mr. Rand's family was his wife. That finding of the jury is not questioned. The jury, however, found that LaTourneau was using the Rand automobile at the time of the collision with the permission of Mr. Rand or the permission of an adult member of his family.

There is no evidence in the record tending to prove that express permission was ever given to LaTourneau by either Mr. or Mrs. Rand to drive the sedan for his own purposes or pleasure. Mr. Rand testified that LaTourneau had been told that the sedan was to be used for certain purposes only, and that LaTourneau was not to use the sedan for his own personal purposes. LaTourneau also testified that he had never been given permission to use the sedan for his own purposes or pleasure; that he had been told not to use it for such purposes; that the sedan was used on the night in question without the knowledge of either Mr. or Mrs. Rand, and without his having intimated to either of them that he was going to make a trip in any of their automobiles. Although there is no evidence tending to prove express permission to use the sedan, the plaintiffs contend that the evidence is sufficient to permit of the inference that LaTourneau had implied permission to use the sedan for his own purposes. Under the holdings of this court and other courts, express permission need not be proved in order to render an insurance company liable under a policy containing an extended insurance or omnibus clause similar to the one here. If the facts adduced in an action, involving an omnibus clause, reasonably tend to show that the automobile covered by the policy at the time of the accident was being used with the implied permission of the assured, that is sufficient to bring it within the coverage of such a clause. *Christiansen v. Ætna Casualty & Surety Co.* 204 Wis. 323, 236 N. W. 109; *Bushman v. Tomek,* 222 Wis. 562, 269 N. W. 289. See numerous cases digested in the note found in 72 A. L. R. commencing on page 1394.

So the question here is whether there is any evidence in the record reasonably permitting the inference that LaTourneau was using the sedan at the time of the collision with the implied permission of Mr. Rand. The evidence which the plaintiffs assert supports a finding of implied permission is substantially as follows: Prior to August 4, 1935, LaTour-

neau was often seen at Brule village in the evening, driving or using some one of the Rand cars. Several times late at night he was seen in taverns, and on such occasions he was driving one of the Rand automobiles. Such evidence, standing alone, certainly does not prove that LaTourneau was using a car for his own purposes with the permission of Mr. Rand. LaTourneau was in the employ of Mr. Rand as a chauffeur and handy man, and consequently had charge of the Rand automobiles in which he often made trips to Brule. No supply of oil or gasoline was maintained at the summer home and such supplies were generally obtained at Brule. It also appears that groceries and supplies were occasionally purchased by the Rand family at Brule, and that mail, express, and freight for the family were obtained there. Under these circumstances, testimony that LaTourneau was often seen at Brule with one of the Rand automobiles, does not tend to show a custom or usage, or a course of conduct, from which general consent or permission to use the Rand automobile for his own pleasure and purposes may be implied. *Christiansen v. Ætna Casualty & Surety Co., supra.* While the witnesses produced did testify that they saw LaTourneau in taverns at Brule, they did not pretend to testify that the trips to Brule were not occasioned by the performance of his duties as chauffeur or handy man. The mere fact that LaTourneau was seen at various times in a tavern at Brule, having come there in one of the Rand cars, does not tend to prove consent or permission, nor does the fact that he was at Brule with one of the Rand cars late at night tend to show that such trip was made with the implied permission of Mr. Rand or of Mrs. Rand. What he did on the night of the accident was clearly without the express permission or knowledge of either Mr. or Mrs. Rand. The fact that on the night in question LaTourneau was at the Woerle and Weyandt taverns with the Buick sedan obviously does not support an inference that he was using the sedan with the implied permission of Mr.

Rand. The fact that he was often seen at Brule in the evening is of no probative value, since his being there was entirely consistent with the performance of his duties as chauffeur and handy man. Such evidence, standing alone and in the absence of proof of other circumstances tending to show knowledge on the part of Mr. Rand that LaTourneau was using the automobiles for his own pleasure or purposes, is insufficient to support a finding of implied permission. That was the very gist of the holding in *Christiansen v. Ætna Casualty & Surety Co., supra.* In order to support an inference that one has the implied permission to use an automobile belonging to another, for his own pleasure and purposes, there must be evidence tending to show a course of conduct or practice known to the owner and acquiesced in by him, or by someone having authority to give permission. *Tomasetti v. Maryland Casualty Co.* 117 Conn. 505, 169 Atl. 54.

The applicable rule was well stated in *Kazdan v. Stein,* 26 Ohio App. 455, 160 N. E. 506, affirmed in 118 Ohio St. 217, 160 N. E. 704:

"Whether a consent is express or implied depends upon the conduct of the party whose consent must be had. Whatever may be the act, circumstance, or fact, in order to recover under the terms of the agreement there must be a connection made with the conduct of the party whose consent, either express or implied, is necessary. Thus there may be acts, circumstances, and facts, such as the continued use of the car, but unless they attach themselves in some way to the acts of the party whose consent must be had there can be no implication of consent arising, because consent signifies some fact or circumstance proceeding from the party who must consent in order to make the act valid. In other words, there must be a nexus between the acts and the voluntary action on the part of him who must consent. The implication, in order to have legal significance, must have the element of mutuality, because in implied consent it is just as necessary to show mutuality as it is in express consent, and as to the latter there is no question that a mutuality of agreement must exist."

There must be a knowledge of such use without objection or reprimand. *Maryland Casualty Co. v. Emma Ronan* (C. C. A.), 37 Fed. (2d) 449.

As before stated, there were three automobiles at the Rand summer home. The sedan was a large powerful seven-passenger automobile. It was purchased in the spring of 1935. It is highly improbable that Mr. Rand would expressly give permission to LaTourneau to take this new automobile out in the middle of the night for his own pleasure or purposes. Nor can it be said that either Mr. or Mrs. Rand ought to have discovered that their automobiles were being so used by LaTourneau. LaTourneau was a trusted employee, and it cannot be said that it was the duty of either Mr. or Mrs. Rand to spy upon LaTourneau who was not under suspicion, for the purpose of ascertaining whether he was taking the automobiles out late at night for his own pleasure or purposes.

The plaintiffs earnestly stress the testimony of the sheriff of Bayfield county who called upon Mr. Rand during the morning following the accident. He testified that he asked Mr. Rand if LaTourneau had permission to use the car, and that Mr. Rand thereupon replied:

"LaTourneau had access to the cars at all times. He is my chauffeur."

Assuming that that statement was made by Mr. Rand, it was a correct and truthful statement of LaTourneau's relationship to the Rand cars, and was not an admission that LaTourneau had express permission to use the automobile at the time in question.

We have carefully read all of the testimony contained in the record bearing upon the question of implied permission, and conclude that there is no evidence which tends to prove a course of conduct on the part of LaTourneau respecting the use of the Rand automobile for his own pleasure or purposes which was known to either Mr. or Mrs. Rand, and which rea-

sonably permits of an inference that LaTourneau was using the Buick sedan on the night in question with the implied permission of Mr. Rand.

*By the Court.*—Judgments reversed as to the Preferred Accident Insurance Company of New York, with directions to dismiss the complaint in the several actions against it.